IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WILDWEST INSTITUTE, and ALLIANCE FOR THE WILD ROCKIES, | CV 13-06-M-DLC |
| Plaintiffs, | |
| vs. | |
| DANIEL ASHE, in his official capacity as Director of the United States Fish and Wildlife Service; and KENNETH SALAZAR, in his official capacity as Secretary of the United States Department of the Interior, | ORDER |
| Defendants, | |
| and | |
| THE STATE OF WYOMING, | |
| Defendant-Intervenor. | |

## I.     INTRODUCTION

Plaintiffs filed suit on January 15, 2013 seeking judicial review of the United

States Fish and Wildlife Service's July 19, 2011 finding that listing of the

whitebark pine (*Pinus albicaulis*) as a threatened or endangered species under the

Endangered Species Act is "warranted but precluded." Plaintiffs claim that the finding was arbitrary and capricious, an abuse of discretion, and otherwise inconsistent with the law and congressional intent for a plethora of reasons.

The Court has before it cross-motions for summary judgment filed by the Plaintiffs (Doc. 28), the Defendants (Doc. 46), and the Defendant-Intervenor State of Wyoming (Doc. 42), as well as Plaintiffs' motion to strike Defendants' objection to Plaintiffs' statement of disputed facts (Doc. 26). For the reasons expressed herein, the Court will grant the Defendants' and Intervenor's motions for summary judgment, deny the Plaintiffs' motion for summary judgment, and deny the Plaintiffs' motion to strike as moot.

## II.   LEGAL STANDARDS FOR "WARRANTED BUT PRECLUDED" FINDINGS

In order for a species to reap the considerable benefits of the Endangered Species Act ("ESA"), it must be listed as either "endangered" or "threatened" under ESA Section 4, 16 U.S.C. § 1533. Section 4 requires the United States Fish and Wildlife Service ("the Service")[1] to "determine whether any species is an endangered species or a threatened species because of any of the following [five] factors: (A) the present or threatened destruction, modification, or curtailment of

---

[1]     The ESA obligates and empowers the Secretary of the Interior. However, since the Secretary acts by and through the United States Fish and Wildlife Service in executing this section of the ESA, the Court will refer to the Service as the operative party for the sake of clarity and accuracy.

its habitat range; (B) overutilization for commercial, recreational, scientific, or education purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1). The Service is required to make such determinations "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). The ESA permits any "interested person" to petition the Service to list a species as threatened or endangered. Within 90 days of receiving such a petition, the Service must make a "finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). If the Service answers this question in the affirmative, it has 12 months from the date it received the petition to issue findings that the petitioned action is either: (i) not warranted; (ii) warranted; or (iii) warranted but precluded. 16 U.S.C. § 1533(b)(3)(B). 16 U.S.C. § (b)(3)(B).

The Ninth Circuit has held that "the circumstances under which the Service may invoke the excuse of 'warranted but precluded' are 'narrowly defined.'" *Ctr. for Biological Diversity v. Kempthorne*, 466 F.3d 1098, 1102 (9th Cir. 2006) (quoting *Ctr. for Biological Diversity v. Norton*, 254 F.3d 833, 838 (9th Cir. 2001)). The Service must find – and publish, "together with a description and

evaluation of the reasons and data on which the finding is based" – that implementing the petitioned action (here, listing of the whitebark pine) must be "precluded by pending proposals to determine whether any species is an endangered species or a threatened species," and that "expeditious progress is being made" to list qualified species and delist those for whom ESA's protections are no longer warranted. 16 U.S.C. § 1533(b)(3)(B)(iii); *see also Kempthorne*, 466 F.3d at 1102. Warranted but precluded findings are expressly subject to judicial review. 16 U.S.C. § 1533(b)(3)(C)(ii).

Species whose listing have been deemed warranted but precluded are referred to as "candidate species,"[2] and the Service is not required to take any meaningful action towards preparing proposed listing rules for such species. *See W. Watersheds Project v. U.S. Fish and Wildlife Service*, 2012 WL 369168, *1 (D. Id. 2012) ("This toothless finding – declaring that the sage grouse deserves protection but doing nothing about it – is known as a 'warranted-but-precluded'

---

[2]     Specifically, the FWS defines a "candidate species" as "one for which [the Service has] on file sufficient information on biological vulnerability and threat to support a proposal for listing as endangered or threatened, but for which preparation and publication of a proposal is precluded by higher-priority listing actions. We may identify a species as a candidate for listing after we have conducted an evaluation of its status on our own initiative, or after we have made a positive finding on a petition to list a species, in particular we have found that listing is warranted but precluded by other higher priority listing actions." Endangered and Threatened Wildlife and Plaints; Review of Native Species That are Candidates for Listing as Endangered of Threatened; Annual Notice of Findings on Resubmitted Petitions; Annual Description of Progress on Listing Actions, 77 Fed. Reg. 69,994, 69,994 (November 21, 2012); *see also Kempthorne*, 466 F.3d at 1101.

finding"). The Service annually publishes an update of the review status of candidate species called a Candidate Notice of Review ("CNOR").

### III.    FACTUAL AND PROCEDURAL BACKGROUND

On December 8, 2008, the Natural Resources Defense Council ("NRDC") submitted a petition to the U.S. Fish and Wildlife Service requesting that it list whitebark pine (*Pinus albicaulis*) as endangered throughout its range and designate critical habitat. The Service failed to make a timely 90-day finding, and the NRDC filed suit in the U.S. District Court for the District of Columbia. Subsequently, the Service published a 90-day finding that listing of the whitebark pine may be warranted. Pursuant to a settlement agreement with NRDC, the Service had to make a 12-month finding whether to list the species by July 11, 2011. The Service published its 12-month finding on the listing of the whitebark pine ("the 12-Month Finding" or "Finding") on July 19, 2011. The Service determined that although warranted, "funding a proposed listing determination for the *Pinus albicaulis* is precluded by court-ordered and court-approved settlement agreements, and listing actions with absolute statutory deadlines, and work on proposed listing determinations for those candidate species with a higher listing priority (i.e., candidate species with LPNs of 1-2)." 76 Fed. Reg. 42,631, 42,649 (July 19, 2011). The 12-Month Report also included a discussion of its expeditious progress on

listing actions, as required by statute. The pertinent details of the 12-Month Finding will be expounded throughout this order.

Plaintiffs filed their complaint against Defendants on January 15, 2013, requesting the Court to reverse the Service's "precluded" determination based on a finding that it is arbitrary and capricious, an abuse of discretion, and/or contrary to law. Specifically, as articulated in their brief supporting their motion for summary judgment, Plaintiffs take issue with: (1) the fact that the whitebark pine has a listing priority number ("LPN") of 2, and there are no species on the waiting list with a LPN of 1; (2) the 12-Month Finding does not provide the necessary description and evaluation of the reasons and data to justify a finding that other LPN 2 species face greater threats than the whitebark pine faces; (3) the Service is listing and proposing to list dozens of species with lower priority LPNs; (4) the Service is relying on self-imposed budget limitations to excuse its delay; and (5) the Service cannot rely on court-ordered deadlines resulting from its legal violations to excuse its delay. (Doc. 29 at 9-10.)

## IV.    STANDARD OF REVIEW

A determination that listing of a species is "warranted by precluded" is subject to judicial review pursuant to 16 U.S.C. § 1533(b)(3)(C)(ii). Judicial review of U.S. Fish and Wildlife Service actions concerning the ESA are governed

by Section 7 of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706.

*Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 981 (9th Cir. 1985).

Under this standard, as relevant to the case at bar, a reviewing court shall "hold

unlawful and set aside agency action, findings, and conclusions" found to be either

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. §706(2)(A). "A decision is arbitrary and capricious if the agency

'has relied on factors which Congress had not intended it to consider, entirely

failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible

that it could not be ascribed to a difference in view of the product of agency

expertise.'" *O'Keeffe's Inc. v. U.S. Consumer Product Safety Comm'n*, 92 F.3d

940, 942 (9th Cir. 1996 (quoting *Motor Vehicle Mfrs. Assn. v. State Farm Mut.

Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). An agency action is also arbitrary and

capricious if the agency does not "articulate a satisfactory explanation for its action

including a rational connection between the facts found and the choice made."

*Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43. An agency must clearly articulate the

grounds on which it acted. *See Atchinson T. & S.F. Ry. v. Wichita Bd. of Trade*,

412 U.S. 800, 807 (1973). The reviewing court must make a "thorough, probing,

in-depth review" of the agency's decision. *Citizens to Preserve Overton Park, Inc.*

*v. Volpe*, U.S. 404, 415-16 (1971). However, the court's review "under the arbitrary and capricious standard is narrow," and it may not "substitute its judgment for that of the agency." *O'Keeffe's Inc.*, 92 F.3d at 942.

Summary judgment is proper if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## V. ANALYSIS

Plaintiffs do not dispute that the listing of the whitebark pine is warranted under the ESA, instead limiting their challenge to the "precluded" portion of the Service's Finding. (Doc. 29 at 18.) Similarly, Plaintiffs do not argue that the Service failed to "determine and present evidence that [it] is, in fact, making expeditious progress in the process of listing and delisting other species" as required by 16 U.S.C. § 1533(b)(3)(B)(iii). *See Ctr. for Biological Diversity v. Norton*, 254 F.3d 833, 838 (9th Cir. 2001). Thus, the only issue before the Court is whether the Service made findings sufficient to determine that listing of the whitebark pine is "precluded by pending proposals to determine whether any species is an endangered or threatened species," 16 U.S.C. § 1533(b)(3)(B)(iii)(I), and published those findings and supporting data and analysis in its 12-Month

Finding. The parties advance several arguments, each of which will be addressed in turn.

## A.    Standing

The Court must first address the threshold issue of standing, which the Defendants raise in their cross-motion. Article III of the Constitution limits the power of the federal courts such that they may only adjudicate live "cases" or "controversies." U.S. CONST. art. III, § 2, cl. The case-or-controversy requirement applies "through all stages of federal judicial proceedings." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). The plaintiff bears the burden of demonstrating that it has standing from the "commencement of the litigation." *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1171 (9th Cir. 2002).

Following the publication of the 12-Month Report in 2011, and prior to the time Plaintiffs filed their complaint, the Service issued two CNORs that address the whitebark pine, the most recent of which was published on November 21, 2012. 77 Fed. Reg. at 70,044. The 2012 CNOR's discussion of the whitebark pine is limited to a two-paragraph summary of the 12-Month Finding, and a reaffirmation that the species is still assigned a Listing Priority Number ("LPN") of 2.[3] *Id.*

---

[3]    For a discussion of LPNs and their significance *see infra*, section V, part B. Since Plaintiffs filed their complaint, the Service has published its 2013 CNOR. The whitebark pine

The Defendants claim that through the CNOR, the Service issued new findings that supersede the original 12-Month Report, which as a result ceases to have any continuing legal effect. In essence, Defendants argue that Plaintiffs were required to challenge the 2012 CNOR, rather than the original 12-Month Finding. Defendants offer no legal support for this position, save for a clause in the 2012 CNOR stating, "This revised notice supersedes all previous animal, plant, and combined candidate notices of review." *Id.* at 69,995.

Defendants' argument is both impractical in effect and wholly unsupported by the record and the law. First, by its express terms the 2012 CNOR only supersedes all previous CNORs, not the original Finding as to the whitebark pine. *Id.* Next, the CNOR makes no new or different findings regarding the whitebark pine, but merely summarizes the 12-Month Finding and reiterates the Service's determination that listing is warranted but precluded. On the other hand, the Finding is 24 pages long and contains the analysis, reasoning, and data required for a warranted but precluded determination. It is both impractical and overly formalistic to require a plaintiff to challenge the meager CNOR rather than the initial finding where the Service performed its substantive review. When interpreting the requirement that the Service "shall promptly publish [a warranted

portion of the 2013 CNOR is identical to the 2012 version. 78 Fed. Reg. 70,104, 70,147-48 (November 22, 2013).

but precluded finding] in the Federal Register, together with a description and evaluation of the reasons and data on which the finding was based," 16 U.S.C. § 1533(b)(3)(B), the Ninth Circuit has taken a hard line, holding that the Service "cannot make a 'warranted but precluded' finding without publishing a description and evaluation of its reasons and data *together with* the finding." *Kempthorne*, 466 F.3d at 1102 (emphasis in original). These published findings provide, *inter alia*, "the basis for review of the Secretary's decision by the court." *Norton*, 254 F.3d at 839. Defendants' position cannot be reconciled with these holdings. If the CNOR superseded and nullified the original findings, compiling and publishing the considerable amount of data and analysis required in the original finding would be a largely pointless exercise. That material would have an extremely short shelf life, since in the timeframe of this type of action, the next CNOR would always be right around the corner. Interested parties would be encouraged – if not forced – to file complaints challenging warranted but precluded findings hastily, rather than upon thorough and careful review of the law and the vast administrative records generated in these cases.[4] Finally, if the most recent CNOR was deemed the

---

[4]     The instant case illustrates this problem perfectly. The Service published its warranted but precluded finding on July 19, 2011. On October 26, 2011, it published a CNOR which included the following statement regarding the Whitebark pine: "*Pinus albicaulis* (whitebark pine) - We previous announced candidate status for this species, and described the reasons and data on which the finding was based, in a separate warranted-but-precluded 12-month petition finding published on July 19, 2011 (76 FR 42631)." 76 Fed. Reg. at 66,373. Under the paradigm Defendants advance, the Plaintiffs in this case would have just over three months in which to file

Service's sole operative document as to a warranted but precluded determination,
the Court would have no meaningful basis upon which to review that
determination. *See id.*

Plaintiffs have presented a live case and controversy based on the Service's
July 19, 2011 Finding, which is neither superseded nor nullified by the subsequent
CNORs.

## B.     LPN Rankings and the Service's Finding as to Higher Listing Priorities

The ESA requires the Service to "establish, and publish in the Federal
Register, agency guidelines to insure that the purposes of this section are achieved
efficiently and effectively. Such guidelines shall include, but are not limited to . . .
a ranking system to *assist* in the identification of species that should receive
priority review under subsection (a)(1) of this section." 16 U.S.C. § 1533(h)(3)
(emphasis added). In response to this mandate, the Service developed a set of
listing priority guidelines ("guidelines"), which provide for the ranking of species
according to: (1) the magnitude of the threats they face; (2) the immediacy of those
threats; and (3) their taxonomic distinctiveness. Endangered and Threatened
Species Listing and Recovery Priority Guidelines, 48 Fed. Reg. 43,098, 43,103
(September 21, 1983). Based on these three criteria, species are assigned a listing

their complaint, lest they be limited to challenge the finding based solely on the single sentence
in the 2011 CNOR.

priority number ("LPN"), ranging from 1 (highest priority) to 12 (lowest priority). *Id.* at 43,102-03. The system was designed in order to "make the most appropriate use of resources available to implement" the ESA. *Id.* at 43,098.

Plaintiffs argue that according to the ESA, Congressional intent, and the Service's listing priority guidelines "FWS must base its warranted but precluded decision solely on whether there are higher priority actions in the form of imminent or pending proposals to list species that face greater threats according to the agency's ranking system." (Doc. 29 at 20.) Plaintiffs claim that once an LPN is assigned, "the agency must 'proceed on a worst-first basis' and list species according to their priority number, starting with 1 and ending with 12." (Doc. 29 at 21) (citing 48 Fed. Reg. at 43,099). Upon a review of the authority Plaintiffs cite to support their position, the Court finds that the Service is not so tightly constrained.

The Service assigned the whitebark pine an LPN of 2, 76 Fed. Reg. at 42,648, which is the highest priority LPN available to a species that is not in a monotype genus. At the time the Service made its finding regarding the whitebark pine, there were no candidate species with an LPN of 1, but there were several species with LPNs of 2 or higher that the Service proceeded to list. Plaintiffs argue that as a result, the Service's finding that listing is warranted but precluded by, *inter alia*, "work on proposed listing determinations for those candidate species

with a higher listing priority (i.e., candidates species with LPNs of 1-2)," *id.* at 42,649, is arbitrary and capricious. This assertion is incorrect for two reasons.

First, the term "higher listing priority" is not necessarily synonymous with "higher LPN." As the 12-Month Finding goes on to state, the Service went on to "further rank the candidate species with an LPN of 2" using several "extinction-risk type criteria." *Id.* Next, and more significantly, neither the ESA nor the guidelines require the Service to list species in strict LPN order. The statute only requires the Service to develop guidelines to "*assist* in the identification of species that should receive priority review." 16 U.S.C. § 1533(h)(3). Additionally, nothing in the guidelines indicates that they are to be applied in the strict and unyielding fashion that Plaintiffs now advance. The guidelines do state generally that it would be "most appropriate to proceed on a 'worst-first' basis and list those species in greatest immediate danger of extinction first." 48 Fed. Reg. at 43,099. Plaintiffs cite this provision, but contort it considerably, stating, "[o]nce a priority number is assigned, the agency must 'proceed on a worst-first basis' and list species according to their priority number, starting with 1 and ending with 12. (Doc. 29 at 21.) This is an overstatement that is not supported by the guidelines, let alone the statutory provision that mandates the creation of those guidelines. The guidelines explicitly state that "[i]nasmuch as [LPN] assignments are subjective to some

degree, and individual species may not be comparable in terms of all considerations, the priority systems presented must be viewed as guides and should not be looked upon as inflexible frameworks for determining resource allocations." 48 Fed. Reg. at 43,098; *see also id.* at 43,101 ("The Service, as has been mentioned above, does not view the priority system as dictating actions so much as providing flexible guides in making rational decisions").

Finally, Plaintiffs cite several passages from a House Conference Report addressing the 1982 amendments to the ESA to support their general position. Most relevant to this particular argument is that "listing agencies should utilize a scientifically based priority system to list and delist species, subspecies and populations based on the degree of threat . . . ." H.R. Conf. Rep. 97-835, *20, 1982 U.S.C.C.A.N. 2862. On its face, this comment simply does not require the Service to make listing decisions on the sole and exclusive basis of the guideline structure it is instructed to develop. Perhaps most critically, as discussed above, the statute itself is devoid of any language that supports Plaintiffs' Congressional intent argument. Congress could have expressly bound the Service to its LPN rankings or some other proxy for degree of threat, but it chose not to do so. The Court will respect that decision.

Neither the ESA, the guidelines promulgated pursuant to the ESA, nor Congressional intent underlying the ESA support Plaintiffs' argument for a rankings-only listing paradigm.[5] Thus, the lack of species with an LPN of 1 does not render the Service's finding that listing of the whitebark pine is precluded by, *inter alia*, "work on proposed listing determinations for those candidate species with a higher listing priority (i.e., candidate species with LPNs of 1-2)" arbitrary and capricious.

Next, Plaintiffs assail the Service's preclusion finding as to the whitebark pine on the basis that the Service is listing and proposing to list numerous species with lower priority LPNs. This argument necessarily fails in light of the Court's holding that the Service is not required to proceed solely on the basis of its LPN rankings when making listing decisions. Additionally, the 12-Month Finding addresses this issue, stating:

> as we work on proposed rules for the highest priority species in the next several years, we are preparing multi-species proposals when appropriate, and these may include species with lower priority if they overlap geographically or have the same threats as a species with

---

[5]     The United States District Court for the District of Columbia recently rejected a similar argument that either the ESA or the guidelines dictate the definitive sequence in which the Service must list candidate species. In *In re ESA Section 4 Deadline Litig.*, 277 F.R.D. 1, 7 (D.D.C. 2011), *aff'd*, 704 F.3d 972 (D.C. Cir. 2013), U.S. District Judge Emmett Sullivan held: "As the statute and the guidelines make clear the priority systems are one tool, among others, designed to assist the FWS in carrying out its function under the ESA. The rankings do not create any requirement – procedural or otherwise – that the agency consider the species in the order they are ranked."

> an LPN of 2. In addition, we take into consideration the
> availability of the staff resources when we determine
> which high-priority species will receive funding to
> minimize the amount of time and resources required to
> complete each listing action.

76 Fed. Reg. at 42,649-50. This justification is highly logical. Multi-species listing actions are an innovative and efficient way to allocate scarce resources, minimize overlap and repetition, and maximize the number of species that receive ESA protection. They are also consistent with the Service's longstanding "philosophy of considering ecosystems" as a whole through a multi-species approach. 48 Fed. Reg. at 43,101. An inflexible blanket prohibition against listing species with lower priority LPNs before those with higher priority LPNs is not supported by law, and would result in an unnecessary and cumbersome constraint upon the Service in carrying out its mandate under the ESA.

Finally, the Service's decision not to proceed on a strict LPN basis does not mean that it ignored the LPN guidelines as Plaintiffs assert. On the contrary, the 12-Month Finding indicates that the LPN rankings were taken into account, along with other factors properly considered as described throughout this order.

**C.     Sufficiency of the Information Provided Regarding "Higher-Priority" Listing Actions**

Plaintiffs argue that the Service's warranted but precluded determination is arbitrary and capricious, an abuse of discretion, and a violation of the ESA because

the 12-Month Finding does not clearly itemize which LPN 2 species are a higher priority than the whitebark pine, nor sufficiently explain why those species are a higher priority. This argument is based on the Service's statutory obligation to publish "a description and evaluation of the reasons and data on which" a warranted but precluded finding is based. 16 U.S.C. § 1533(b)(3)(B)(iii).

The 12-Month Finding describes its approach in further ranking candidate species with an LPN of 2 utilizing independent assessments outside of the LPN guideline structure. The Finding states that the Service uses the following "extinction-risk type criteria: International Union for the Conservation of Nature and Natural Resources (IUCN) Red list status/rank, Heritage rank (provided by NatureServe), Heritage threat rank (provided by NatureServe), and species with fewer than 50 individuals, or 4 or fewer populations. Those species with the highest IUCN rank [], the highest Heritage rank [], the highest Heritage threat rank, [] and currently with fewer than 50 individuals, or fewer than 4 populations, originally comprised a group of approximately 40 candidate species ('Top 40')." 76 Fed. Reg. at 42,649.

Plaintiffs take issue with the Service's use of the additional extinction-risk criteria because: (1) their full mechanics are not disclosed in the 12-Month Finding; and (2) the use of such criteria constitutes an additional ranking system

that was not approved and published in the Federal Register as required by 16 U.S.C. § 1533(h)(3). Section 1533(h)(3) requires the Service to establish guidelines, which it did. Notice and comment is required on "any guideline (including any amendment thereto) proposed to be established under this subsection," and the extinction risk criteria ranking scheme was not proposed to be established under that subsection. The Section does not apply to all criteria that the Service utilizes when making its preclusion determination. The Service is within its right to apply these additional criteria, and the fact that they involve ranking schemes does not subject them to the notice and comment requirements of § 1533(h)(3). Finally, the Service provided an adequate amount of information about the mechanics of these additional criteria for the Court to determine that neither their use nor the resulting outcome is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law.

The 12-Month Finding also includes a table of "high-priority listing actions"[6] that includes the name and LPN of each species included in each action,

---

[6]   The Court rejects Plaintiffs' contention that because this table contains species with lower priority LPNs, it cannot be construed as a list of higher-priority actions upon which the Service's ultimate determination was based (Doc. 29 at 24-25). As established above, the Service is not bound to list species on a strict LPN basis, and may properly consider administrative and budgetary resources, as well "extinction risk criteria" found outside of the LPN guidelines. It follows that the Service is permitted to marshal its limited resources in the most efficient manner possible by preparing multi-species proposals when appropriate, which may include "species with lower priority if they overlap geographically or have the same threats as a species with an LPN of 2." 76 Fed. Reg. at 42,649-50.

and the action itself (all of which happen to be proposed listings). Plaintiffs argue

that 16 U.S.C. § 1533(b)(3)(B)(iii), as applied by the Ninth Circuit and other

courts, requires considerably more information about each of the species on the

"high-priority action" list – particularly those LPN 2 species that made the list.

In *Center for Biological Diversity v. Kempthorne*, the plaintiff challenged a

warranted but precluded finding as to the Sierra Nevada Mountain Yellow-Legged

Frog on the grounds that, *inter alia*, the Service failed to identify proposals for

other listings that preclude listing the frog in the decision itself. 466 F.3d 1098,

1099 (9th Cir. 2006). Despite this shortcoming, the district court upheld the

finding, holding that the "Service's path could reasonably be discerned" by looking

to current CNOR's description of pending listing actions and the listing program

budget. *Id.* at 1099-1102. The CNOR was part of the administrative record, but

was not referenced in the decision itself. *Id.* at 1102. The Ninth Circuit reversed,

---

The vast majority of the high-priority actions related to species with an LPN of 3 or higher are coupled with a species that has an LPN of 2. There are, however, two actions without a member species with an LPN of 2 – the "Miami blue butterfly (LPN of 3)" and the "12 Puget Sound prairie species" (highest species LPN of 3). The Service fails to articulate why these two actions were deemed "high-priority," as its extinction-type criteria explanation and multi-listing action justifications do not extend to actions lacking an LPN 2 species. However, in light of all of the other information and reasoning provided in the decision, this very minor omission does not justify a judicial decree setting aside the overall finding for any of the reasons articulated in 5 U.S.C. § 706(2).

There are also tables of "Actions Subject to Court Order/Settlement Agreement" and "Actions With Statutory Deadlines." Both categories are also listed as bases for the warranted but precluded determination, 76 Fed. Reg. At 42,649, but since Plaintiffs limit this argument to the "High-Priority Listing Actions," the Court will not address these additional classifications.

interpreting 16 U.S.C. § 1533(b)(3)(B) to mean that "the Service cannot make a

'warranted but precluded' finding without publishing a description and evaluation

of its reasons and data *together with* the finding." *Id.*[7] (emphasis in original). The

Court concluded that:

> It is insufficient for requisite determinations to be lurking
> in the administrative record yet be unidentified in the
> decision itself. Likewise, they may not be implied from
> other published findings that are neither referenced in nor
> published with the decision under review. Deficiencies in
> the "warranted but precluded" finding cannot be cured by
> earlier, or later, findings, published or not, that are not
> part of the administrative decision itself or published
> together with it.

*Id.* at 1104. Thus, *Kempthorne* does not explicitly require the full extent of what

Plaintiffs demand. Upon reviewing the meager preclusion portion of the 12-month

finding underlying the Ninth Circuit's decision, the Court finds that *Kempthorne*

does not implicitly support Plaintiffs' argument either. The extent of the Service's

preclusion finding in that case was limited to a single paragraph:

> While we conclude that listing the [Frog] is warranted, an
> immediate proposal to list is precluded by other higher
> priority listing actions. During Fiscal Year 2003 we must

---

[7]        In light of the holding in *Kempthorne*, the Court rejects the Service's argument that the
Court may took to other parts of the record, outside the 12-Month Finding, when determining the
sufficiency of the 16 U.S.C. § 1533(b)(3)(B)(iii) finding (Doc. 48 at 38-39). *See Kempthorne*,
466 F.3d at 1099-1100 ("the district court upheld the finding of 'warranted but precluded'
because the Service's path could be reasonably discerned. We conclude that this option is not
available under the ESA"). However, as established herein, the Court finds that the 12-Month
Finding, standing alone, satisfies the requirements of § 1533(b)(3)(B).

> spend nearly all of our Listing Program funding to
> comply with court orders and judicially approved
> settlement agreements, which are now our highest
> priority actions. To the extent that we have discretionary
> funds, we will give priority to using them to address
> emergency listings and listing actions for other species
> with a higher priority. Due to litigation pertaining to
> various listing actions, our planned work with listing
> funds in Fiscal Year 2003 consists primarily of
> addressing court-ordered actions, court-approved
> settlement agreements, and listing actions that are in
> litigation. (Also, some litigation-related listing actions
> already are scheduled for Fiscal Year 2004.) We expect
> that our discretionary listing activity in Fiscal Year 2003
> will focus on addressing our highest priority listing
> actions of finalizing expiring emergency listings.

68 Fed. Reg. 2,282, 2,303 (January 16, 2003). This conclusory paragraph – devoid

of any specificity as to budget constraints and any discussion of which species are

considered higher-priority and why – is a far cry from the preclusion finding in the

case now before the Court. While the whitebark pine's 12-Month Finding does not

disclose the additional ranking for all of the LPN 2 species on the high-priority list

based on the "extinction-risk type criteria," nor provide a detailed justification for

precisely why each of these species is on that list instead of the whitebark pine,

such exhaustive detail is not required by the ESA, nor the decision in *Kempthorne*.

Furthermore, if the Court required the Service to furnish the reams of data and

analysis the Plaintiffs seek, it would place additional strain on the Listing Program

budget, which all parties agree is already under considerable stress. The return on

such an investment would be minimal, since the 12-Month Finding provides a sufficient "basis to evaluate the Secretary's conclusion that immediate action is precluded by other more urgent matters," *Norton*, 254 F.3d at 839.

Finally, the Court declines to adopt the approach taken in *California Native Plant Society v. Norton*, in which the United States District Court for the District of Columbia criticizes a CNOR that fails to articulate with specificity why certain species with the same LPN as the precluded species were listed before that species. 2005 WL 768444, *8 (D.C.C. 2005). The Court's statement appears to be based on the decision in *Center for Biological Diversity v. Norton*, 2004 WL 1406325 (D. Or. 2004). However, that case does not state that the Service must exhaustively detail and distinguish species that "make the cut" from the species that do not, despite having the same LPN as those more fortunate species. The Service's finding in *Norton* is very similar to that in *Kempthorne*, and the court found it inadequate under the express requirements of 16 U.S.C. § 1533(b)(3)(B)(iii), not under some heightened standard triggered by species with the same LPN.

The Service provided sufficient reasoning and data upon which the finding that listing of the whitebark pine is "precluded by pending proposals to determine whether any species is an endangered species or a threatened species" as required by 16 U.S.C. § 1533 (b)(3)(B)(iii). In the case of the whitebark pine, the Service

turned in its homework, *Kempthorne*, 466 F3d at 1103, which the Court now gives

a passing grade.

## D.     The Role of Funding in the Service's Warranted but Precluded Finding

At the heart of the Service's "but-precluded" finding is its assertion that it

does not have the resources necessary to list the whitebark pine because those

resources have been absorbed or will be absorbed by other proposed listing actions.

The Service acknowledges as much in the first sentence of its "precluded"

discussion:

> Preclusion is a function of the listing priority of a species
> in relation to the resources that are available and the cost
> and relative priority of competing demands for those
> resources. Thus, in any given fiscal year (FY), multiple
> factors dictate whether it will be possible to undertake
> work on a listing proposal regulation or whether
> promulgation of such a proposal is precluded by higher-
> priority listing actions.

76 Fed. Reg. at 42,648. Plaintiffs argue that because "the ESA, Congress, and the

Supreme Court require that FWS list and protect species 'whatever the cost' . . .

and that cost is a factor which Congress has not intended FWS to consider," the

Service's reliance on cost as the main reason for preclusion is arbitrary and

capricious. (Doc. 51 at 10 (internal citations and quotation marks omitted).) Thus

the Court must resolve the question of whether cost and resource limitations may

properly play a role in a "but-precluded" finding. Although the Court laments the

lack of funding available to the Service, it has little trouble answering this question in the affirmative.

The 12-Month Finding describes the Service's financial constraints in some detail. The Service outlines the numerous activities that are funded by the Congressional appropriation for the "Listing Program," the median costs for several types of listing actions, and the statutory listing cap[8]. 76 Fed. Reg. at 42,648. The Finding then goes on to describe generally how the funds allocated to the Listing Program budget for FY 2011 – a total of $20,902,000 – have been earmarked, concluding that:

> In FY 2010, the Service received many new petitions and a single petition to list 404 species. The receipt of petitions for a large number of species is consuming the Service's listing funding that is not dedicated to court-ordered commitments. Absent some ability to balance effort among listing duties under existing funding levels, it is unlikely that the Service will be able to initiate any new listing determination for candidate species in FY 2011.

*Id.* at 42,649. In essence, the Service's workload in this area far outpaces its resources and budget.

---

[8]      As described in the finding: "in FY 1998 and for each fiscal year since then, Congress has placed a statutory cap on funds that may be expended for the Listing Program, equal to the amount expressly appropriated for that purpose in that fiscal year. This cap was designed to prevent funds appropriated for other functions under the Act (for example, recovery funds for removing species from the Lists), or for other Service programs, from being used for Listing Program actions (see House Report 105-163, 105th Congress, 1st Session, July 1, 2997)." 76 Fed. Reg. at 42,648.

As a threshold issue, much of Plaintiffs' first argument as to cost is based on a passage from *Tennessee Valley Authority v. Hill*, in which the Supreme Court stated that "the plain intent of Congress in enacting [the ESA] was to halt and reverse the trend towards species extinction, whatever the cost." 437 U.S. 153, 184 (1978). However, this sentence from *Hill* cannot be stretched to support Plaintiffs' extrapolation that Congress did not intend cost to be a factor in preclusion determinations. Before the Court in *Hill* were the consultation related provisions contained in Section 7 of the ESA, *id.* at 173, which, *inter alia*, require federal agencies to ensure that "actions authorized, funded, or carried out by them do not jeopardize the continued existence . . . of endangered species and threatened species." 16 U.S.C. 1536(a)(2). The instant case is wholly unrelated to Section 7, and is limited to the listing related provisions contained in Section 4. Unlike the snail darter in *Hill*, the whitebark pine has not yet been listed and therefore is not subject to the Section 7 considerations contemplated in that case. The Court declines to extend the Supreme Court's holding on the role cost may play under Section 7 to Section 4, particularly in light of the strong contrary evidence described below.

Several courts have indicated that resource restrictions are properly considered as part of the Service's preclusion analysis. In *Norton*, the Ninth Circuit

described the "but-precluded" portion of a finding as a statement "that a final rule cannot be issued right away, for administrative reasons, thereby excusing the Secretary from issuing a final rule." 254 F.3d at 838. *See also W. Watersheds Project*, 2012 WL 369168, *11 ("The LPN will determine where in the priority line the species stands, and the agency's resources will determine how far down the line the agency can go . . ."); *California Native Plant Soc'y v. Norton*, 2005 WL 768444, *8 (D.C. Cir. 2005) ("Stripped to their essence, FWS's basic explanations for why listing the Spineflower and other species was warranted but precluded were that FWS had statutorily mandated deadlines, court-ordered actions, higher priority listing activities, and a very limited budget. Despite protests from the plaintiffs, all of these explanations are legitimate"). In the rule establishing the LPN guidelines, the Service indicates that those guidelines will serve to "make the most appropriate use of the limited resources to implement the Act." 48 Fed. Reg. 43,098, 43,098 (September 21, 1983). Additionally, from a practical standpoint, if the Court were to adopt Plaintiffs argument that budgetary constraints are irrelevant in making preclusion determinations, it would in essence negate any need for a "warranted but precluded" provision, because in a world where money is no issue, it is entirely unclear what exactly would preclude a warranted listing.

The Service properly considered the cost of pending proposals in the context of their anemic Listing Program budget when determining that listing was precluded.

Plaintiffs next take issue with the Service's budget requests, arguing that when compared to the amount of funding required to address the Listing Program backlog, the Secretary of the Interior's relatively low budget requests constitute a form of the "foot-dragging efforts of a delinquent agency" that Congress instructed the Courts to separate from "justifications [for preclusion] grounded in the purpose of the act." H.R. CONF. REP. 97-835, 1982 U.S.C.C.A.N. 2860, 1982 WL 25084 (Leg. Hist.). Plaintiffs go so far as to identify "FWS's failure to request adequate funding to meet its legal obligations" as "the key issue in this case . . . ." (Doc. 51 at 10.) Plaintiffs also imply that since Congress allocated 99.9% of what the Service requested for the Listing Program in FY 2011, the Service need only ask for additional funds, and it shall receive whatever it requests.

The argument that the Service's budget limitations are "self-imposed," (Doc. 29 at 35), is overly simplistic and lacks any legal support. The Service's failure to identify precisely and then request the funding required to resolve the backlog and list all "warranted" species, including the whitebark pine, does not render the Service's determination arbitrary and capricious. Nor does it necessarily represent

the foot dragging Congress warned of. Plaintiffs' appropriation argument provides only a snapshot of the summit of what is perhaps the Mt. Everest of the federal government's bureaucratic endeavors: the annual appropriation and budgeting process. The Court has no trouble taking the Service at its word that its funding request for the Listing Program is inextricably linked to numerous internal and external factors. The Court does not believe that any good would come out of requiring the Service to increase its funding requests based exclusively, or almost exclusively, on need – in effect making that determination in a vacuum – lest it be stripped of its statutory right to preclude listing a warranted action based at least in part on limited resources. This approach is not mandated by the Act, nor is it likely to generate a figure that is balanced by other critical budgetary considerations and political and fiscal realties. Such a paradigm would be counterproductive, and would place a considerable and wholly unnecessary burden on an already complex, contentious, and resource-intensive appropriations process. Finally, there is no reason to believe that because Congress appropriated almost all of the funds the Service requested for its Listing Program in the past, it would continue to do so in the future if that figure was multiplied several times to reflect the complete needs of the Listing Program.

Plaintiffs cite several cases to support their argument as to the self-imposed nature of the Service's budgetary constraints, none of which the Court finds availing. In *Western Watersheds*, Judge Winmill calls into question the disparity in the funds needed to address the Listing Program backlog and the funds requested by the Secretary, and states that some of the funding short-falls are "self-inflicted, making it disingenuous for the FWS to paint itself as a helpless victim of external forces." 2012 WL 369168, *16 (D. Idaho 2012). However, the court went on to rule on a very narrow basis that the Service's warranted but precluded decision was not arbitrary or capricious. *Id.* at *17. In *Center for Biological Diversity v. Norton*, a case in which the Service failed to timely issue a 12-month finding, the Court similarly acknowledged that, "It also bears noting that the Secretary's financial predicament may be, in part, the product of its own making. In the Effect Statement to the Conference Managers regarding the Fiscal Year 2001 Interior Appropriations Bill, the Department of Interior admitted that 'the listing program is not proposed at a level that would allow the Service to meet all of the Act's requirements and deadlines.'" 163 F. Supp. 2d 1297, 1300 (D.N.M. 2001) (internal citations omitted). Although the court ruled against the Service and ordered the Secretary to promptly publish the 12-month finding, its decision was not based on self-imposed budgetary shortcomings. The other cases Plaintiffs cite are similarly

distinguishable, and none goes so far as to find a warranted but precluded determination arbitrary and capricious, or otherwise in violation of 5 U.S.C. §706(2)(A), because the Secretary failed to request sufficient funding to fully fund the Listing Program.[9]

The Court is not unsympathetic to the Plaintiffs' general argument, however, and was surprised by the relatively paltry amount requested and allocated for the Listing Program, given the myriad of activities that fall under its ambit[10], and the lofty and worthy purpose Congress articulated for the ESA: "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b). There is no question that the Listing Program is underfunded, and as a result, many candidate species otherwise deserving of the Act's wide protections are languishing in "warranted but precluded" limbo. The Court does not disagree with the Districts of Idaho and New Mexico that the Service and the Secretary of the Interior could likely play a more active and aggressive part in narrowing the gap between what is needed and what is allocated for the Listing Program by requesting and sufficiently

---

[9]     *See* (Doc. 29 at 27-30).

[10]    *See* 76 Fed. Reg. at 42,648 (describing the activities covered by the Listing Program appropriation).

justifying additional funds. However, Congress is ultimately endowed with the exclusive authority to appropriate funds, and thus to grant, deny, or modify any request that the Secretary might make. *See* U.S. CONST. art. I, § 9, cl. 7. The Court declines to take the drastic step of overturning the warranted but precluded determination pursuant to 5 U.S.C. § 706(2)(A) based on the agency's alleged failure to do its level best to obtain the full amount needed to fund the Listing Program.

**E.  ESA Section 4 Multi-District Litigation Settlement Agreements**

On September 9, 2011, Judge Emmet Sullivan of the United States District Court for the District of Columbia approved two separate but related settlement agreements in a multi-district litigation between the Service and WildEarth Guardians and the Center for Biological Diversity ("CBD"). *In re ESA Section 4 Deadline Litig.*, Misc. Action No. 10-377 (EGS), MDL Docket No. 2165 (D.D.C.), ECF Docs. 55, 56 (September 9, 2011). These MDL agreements commit the Service to resolve the listing status of hundreds of species. Under the agreement with WildEarth, the Service agreed to complete initial petition findings for over 600 species and to either issue proposed listing rules or not-warranted findings for all 251 candidate species on the 2010 CNOR by the end of FY2016 – a considerable and aggressive task, which in the opinion of this Court demonstrates

the Service's general level of commitment to its listing activities. CBD initially objected to the Guardian agreement, prompting Judge Sullivan to order the parties into mediation. CBD eventually reached a separate agreement with the Service. The WildEarth agreement was signed and submitted to the court on May 10, 2011, and the CBD agreement was signed and submitted to the court on July 12, 2011. Both MDL agreements state that they are effective as of the date they are approved by the court. Judge Sullivan approved and adopted both MDL agreements as enforceable court orders on September 9, 2011. Again, the 12-Month Finding on the whitebark pine was issued on July 19, 2011.

The Service states that it did not consider – and was not required to consider – the MDL agreements in making its warranted but precluded finding. Plaintiffs first argue that the Service's failure to do so renders the determination arbitrary and capricious. Since Judge Sullivan did not adopt the agreements until after the Service issued its whitebark pine 12-Month Finding, those agreements were not legally binding at the time the Finding was issued. The Service had no final and binding obligation to perform the tasks outlined in the agreements, and to require it to consider and articulate *potential* future commitments goes beyond what is required of 12-month findings; Plaintiffs cite no legal support to the contrary. This is particularly true in a situation such as this where the litigation and negotiation

that culminated in the MDL agreements was extensive and contentious. As late as June 27, 2011, Safari Club International moved to intervene to oppose and defeat the MDL agreements.[11] Against this backdrop, there was substantial uncertainty regarding the judicial approval of the MDL settlement agreements. Finally, implicit in the Plaintiffs' argument is that judicial approval of a settlement agreement is a rubber stamp, a notion that this Court roundly rejects.

Plaintiffs also argue that the Service "should have disclosed and addressed these [MDL] commitments in the whitebark pine rule, and explained how or why all of the species in the settlement agreement are a higher priority than the whitebark pine." (Doc. 51 at 21.) As established above, the Service was required to do no such thing because at the time, there were no binding commitments. Furthermore, even if the agreements had been binding prior to the Service's 12-Month Finding on the whitebark pine, they would presumably be included in the portion of the finding that listing "is precluded by court-ordered and court approved settlements," and included in the list of "Actions Subject to Court Order/Settlement Agreement," rather than the portion of the finding related to "higher listing priorities" and its accompanying list. Plaintiffs conflate two distinct categories of actions that contribute to the preclusion finding. Preclusion by higher

---

[11]    The court denied the motion on the same day it adopted the MDL agreements. *In re Endangered Species Litig.*, 277 F.R.D. 1 (D.D.C. September 9, 2011).

listing priorities is not part of the preclusion standard under 16 U.S.C. §

1533(b)(3)(B)(iii), and is only at issue here because of the Service's express

finding regarding such higher priority actions.

**F.      Consideration of Court-Ordered Deadlines and Other Listing Actions**

The Court rejects Plaintiffs' arguments that the Service may not consider

existing court-ordered deadlines in making its preclusion finding. The Service is

required to comply with court orders, and failure to do so may result in an order of

contempt. Furthermore, Plaintiffs offer no meaningful support that associated

compliance costs are not properly considered as part of a preclusion decision.

Neither *Norton* case the Plaintiffs cite addresses the role of court-ordered deadlines

in preclusion findings. *Norton*, 304 F.Supp.2d at 1177 (involving re-designation of

critical habitat); *Norton*, 163 F.Supp.2d at 1299 (involving the Secretary's duty to

issue 12-month findings).

Finally, Plaintiffs state that any pending critical habitat designations cannot

preclude listing, because the language of 16 U.S.C. 1533(b)(3)(B)(iii)(I) states that

only pending listing proposals may preclude other listing proposals. However, the

Defendants clarify that the Service did not consider any critical habitat

designations for previously-listed species; it only considered designations

addressing then-unlisted species, which were made concurrently with proposed or

final listing rules. A review of the 12-Month Finding supports Defendants' assertion. The ESA expressly requires this approach, stating that the Service shall, "concurrently with making a determination . . . that a species is an endangered or a threatened species, designate any habitat of such species which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A)(i).

## VI.   STATEMENTS OF UNDISPUTED/DISPUTED FACTS IN APA CASES

As a final matter, the Court must clarify what is required as far as the statements of undisputed and disputed facts that are necessary to accompany motions for summary judgment pursuant to Local Rule 56.1 in cases involving judicial review under the Administrative Procedures Act. While Defendants are correct that in such cases the Court's task is to apply the appropriate APA standard of review to the agency decision based on the agency's administrative record, the parties must still comply with Local Rule 56.1 and submit statements of disputed and undisputed fact. These documents assist the Court by providing a digestible narrative of the events memorialized in the administrative record, which is often voluminous. In situations such as this, the parties may wish to avail themselves of the option to file a statement of stipulated facts pursuant to Local Rule 56.1(c).

In this instance, Defendant's failure to comply with Local Rule 56.1 did not inconvenience the Court, and was not prejudicial to either party. The Court has

fully resolved the underlying matter on summary judgment, will therefore deny the Plaintiffs' motion as moot.

## VII. CONCLUSION

The U.S. Fish and Wildlife Service satisfied its obligations under 16 U.S.C. § 1533(b)(3)(B)(iii). The 12-Month Finding that concludes listing of the whitebark pine is warranted but "precluded by court-ordered and court-approved settlement agreements, and listing actions with absolute statutory deadlines, and work on proposed listing determinations for those candidate species with a higher listing priority," is sufficiently detailed and supported. The Finding is not arbitrary and capricious, an abuse of discretion, nor otherwise not in accordance with the law.

IT IS ORDERED that:

(1)     The Plaintiffs' motion for summary judgment (Doc. 28) is DENIED.

(2)     The Federal Defendants' cross-motion for summary judgment (Doc. 46) is GRANTED.

(3)     The Defendant-Intervenor State of Wyoming's cross-motion for summary judgment (Doc. 42) is GRANTED.

(4)     The Plaintiffs' motion to strike objection (Doc. 56) is DENIED as moot.

(5)     Any pending motions are DENIED as moot, and all dates and

        deadlines in this case are VACATED.

(6)     This case is now closed. The Clerk of Court is directed to enter

        judgment in favor of the Defendants and the Defendant-Intervenor

        pursuant to Federal Rule of Civil Procedure 58(a).

Dated this 25th day of April, 2014

Dana L. Christensen, Chief District Judge
United States District Court